## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CHRISTOPHER TODD RUGGIERI    )
                                      )
       Plaintiff,                    )
                                        )
v.                                             )    Case No.: 2:18-CV-0476-LCB
                                        )
THE CITY OF HOOVER,        )
                                        )
       Defendant.              )

## <u>MEMORANDUM OPINION</u>

The procedural history of this case was set out in this Court's memorandum opinion entered on May 3, 2019. (Doc. 49). As discussed in that opinion, this Court dismissed all but one of Ruggieri's[1] claims. The City of Hoover ("City") also filed a counterclaim. (Doc. 24). Presently before the Court is Ruggieri's "Motion Requesting Default Judgment and Complete Dismissal of the City of Hoover's Counterclaim" (Doc. 56)[2]; the City's Motion for Summary Judgment as to Ruggieri's remaining claim and its own counterclaim (Doc. 60); the City's motion to strike the medical records that Ruggieri attached to his response to its

---

[1] Ruggieri is appearing *pro se*.

[2] Before filing the motion for default judgment, Ruggieri filed a motion for summary judgment and an amended motion for summary judgment. (Docs. 51 and 52). Accordingly, the Court finds that Ruggieri's first motion for summary judgment (Doc. 51) is **MOOT**. Ruggieri then filed a motion to withdraw his amended motion for summary judgment. (Doc. 55). Accordingly, the Clerk is directed to **TERM** Ruggieri's amended motion for summary judgment. (Doc. 52).

motion for summary judgment as well as Ruggieri's sur-reply to the City's reply in support of its motion for summary judgment (Doc. 68); Ruggieri's "Motion for Summary Judgment based upon Defense/Defendant Misconduct" (Doc. 71); and the City' motion to strike Ruggieri's "Motion for Summary Judgment based upon Defense/Defendant Misconduct" (Doc. 72).

## I.    Background and Jurisdiction

Ruggieri's claim arises under the Americans with Disabilities Act ("ADA"); specifically, 42 U.S.C. § 12112(d)(4)(A).    Accordingly, this Court has original jurisdiction of that action under 28 U.S.C. § 1331.

The City asserted that this Court has supplemental jurisdiction over its counterclaim pursuant to 28 U.S.C. 1367(a), which provides, in pertinent part: "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  Ruggieri has not challenged the Court's jurisdiction over the City's counterclaim.    However, federal courts are courts of limited jurisdiction; thus, a federal court must take care to ensure that it has jurisdiction for all cases that come before it.  *See Rembert v. Apfel*, 213 F.3d 1331, 1333-34 (11th Cir. 2000).  To that end, a district court must always answer the question of whether it has subject

matter jurisdiction to hear a case, even if no party raises the question of jurisdiction by motion. *See Id.; Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001)("[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises."). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

In discussing supplemental jurisdiction in *Woodard v. Town of Oakman, Ala.*, 970 F. Supp. 2d 1259, 1275 (N.D. Ala. 2013), Judge Coogler explained:

> Supplemental jurisdiction entails a two-step inquiry where the Court must first determine whether it *can* exercise its supplemental jurisdiction and then whether it *should* exercise that jurisdiction. *See Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 701 F.3d 669, 679 n. 7 (11th Cir. 2012)(noting the different standards of review for these aspects of supplemental jurisdiction). Section 1367(a) provides the power of supplemental jurisdiction only when the claims "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). For the Court to have the power to exercise supplemental jurisdiction, the claims must "'derive from a common nucleus of operative fact.'" *Upper Chattahoochee Riverkeeper Fund, Inc.,* 701 F.3d at 679 (*quoting United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). If the Court has the power to exercise supplemental jurisdiction as specified in § 1367(a), it must nonetheless consider § 1367(c) to determine whether jurisdiction over the state claim is appropriate. *See Parker*[ *v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 742 (11th Cir.2006)].

In discussing the first step of that analysis, i.e., whether a district court *can* exercise supplemental jurisdiction, the Eleventh Circuit explained:

> We take the nucleus of facts on which the federal question claims are based and compare it to the nucleus of facts on which the state law claims are based. We do not look at the results that may flow from the implications of finding that supplemental jurisdiction does not exist. It is not a results-oriented analysis, but a fact-oriented one.

*Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 701 F.3d 669, 679 (11th Cir. 2012).  For the reasons that follow, the Court finds that the City's counterclaim and Ruggieri's ADA claim do not share a common nucleus of operative facts.  Therefore, this Court need not reach the second step of the analysis, i.e., whether it *should* exercise supplemental jurisdiction.

Ruggieri's claim, of which this Court has original jurisdiction, arises out of his employment with the City, which began in July of 2015 and continued until his resignation on November 16, 2017.  Ruggieri was employed in the City's information technology department as a Network Systems Specialist.  In July of 2017, the City required Ruggieri to attend three counseling sessions with a psychologist through the American Behavioral Employee Assistance Program ("EAP").  According to the City, Ruggieri's supervisor referred him to the counseling sessions after coworkers complained about his behavior.  In his complaint, Ruggieri asserted that his required attendance at those counseling

sessions violated the Americans with Disabilities Act, specifically; 42 U.S.C. § 12112(d)(4)(A).

The City's counterclaim is essentially a breach-of-contract action that arises out of a tuition-reimbursement agreement that it entered into with Ruggieri. While employed with the City, Ruggieri attended classes at the University of Alabama at Birmingham where he obtained a master's degree. The City reimbursed Ruggieri for the cost of obtaining that degree as part of a tuition-reimbursement program offered to City employees. In its counterclaim, the City alleged that, under the terms of the agreement, Ruggieri was required to pay back the full amount of the tuition if his employment terminated within one year of the tuition reimbursement. The City alleged that Ruggieri resigned within that year and has yet to pay back the money. Therefore, the City argues, Ruggieri is in violation of the agreement.

After reviewing the record and the evidence contained therein, the Court finds that Ruggieri's resignation, which was the triggering event for the City's breach-of-contract counterclaim, is not related to his ADA claim. As will be discussed in more detail below, Ruggieri's ADA claim arises out of counseling sessions that he was required to attend after his supervisors received complaints about his behavior. Several weeks after Ruggieri's counseling sessions ended, the City placed Ruggieri on administrative leave pending an investigation into allegations that Ruggieri used his position to intercept emails from other City

employees.   According to Ruggieri, the City then performed a forensic examination of his work computer and determined that he had improperly accessed certain emails.   However, Ruggieri contends that the evidence against him was either tainted or was purposely fabricated.   After the investigation was completed, Ruggieri was told that he would be entitled to a hearing and would be allowed to present evidence in his defense to a panel of City employees the following Monday.   However, Ruggieri chose to forgo that hearing and immediately resigned.   It was this resignation that allegedly triggered the repayment clause in the tuition-reimbursement agreement between Ruggieri and the City.

Thus, the Court does not find that Ruggieri's ADA claim and the City's counterclaim "derive from a common nucleus of operative fact." *Woodard*, 970, F. Supp. 2d at 1275.   It follows that City's counterclaim is not "so related" to Ruggieri's ADA claim that it "form[s] part of the same case or controversy under Article III of the United States Constitution."   Ruggieri did not assert a claim for constructive discharge, retaliation, or any other cause of action relating to his separation from the City.   As noted, the facts surrounding Ruggieri's ADA claim revolve around his allegedly aberrant behavior and his supervisor's resultant decision to send him to counseling.   The investigation into Ruggieri's alleged misuse of his position began more than two months after his counseling sessions ended and had nothing to do with Ruggieri's behavior or the counseling sessions.

6

Because the two claims do not share a common nucleus of operative facts, the Court does not have supplemental jurisdiction over the City's counterclaim, and that claim must be dismissed without prejudice to the City's right to refile the action in the appropriate forum. Fed. R. Civ. P. 12(h)(3).

The Court will now turn to each of the pending motions. All of the motions have been fully briefed and are ripe for review.

## II. Ruggieri's "Motion Requesting Default Judgment and Complete Dismissal of the City of Hoover's Counterclaim" (Doc. 56)

In this motion, Ruggieri asks the Court to grant a default judgment in his favor because, he says, the defense failed to produce certain documents and failed to provide deposition testimony of certain witnesses. Ruggieri does not cite to any rule or other authority to support his proposition that a default judgment should be entered in his favor. However, Ruggieri's motion is focused on his allegation that the City failed to properly respond to his discovery requests. Thus, the relief he is requesting is governed by Rule 37 of the Federal Rules of Civil Procedure.

Rule 37(b)(2)(A), sets out a non-inclusive list of sanctions that a court may impose on a party if it fails to obey an order to provide or permit discovery. Fed. R. Civ. P. 37(b)(2)(A). Among those sanctions is a default judgment against the offending party. The Eleventh Circuit has held:

> [A]lthough Rule 37 confers upon district court judges broad discretion
> to fashion appropriate sanctions for the violation of discovery orders,

*see Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993), this discretion is not unbridled. *Wouters v. Martin County*, 9 F.3d 924, 933 (11th Cir. 1993). The decision to dismiss a claim or enter default judgment "ought to be a last resort—ordered only if noncompliance with discovery orders is due to willful or bad faith disregard for those orders." *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1556 (11th Cir. 1986).

*United States v. Certain Real Prop. Located at Route 1, Bryant, Ala.,* 126 F.3d 1314, 1317 (11th Cir. 1997). The discovery requests at issue are a list of files allegedly contained in the City's computer system[3] and the depositions of Greg Boykin, Brian Foshee, Melinda James Lopez, and "the officer that performed the forensic analysis" of Ruggieri's work computer. (Doc. 56, p. 2-3).

### A. The list of files

As to the list of files at issue, the City claims to have produced all of the responsive documents in its possession. However, Ruggieri contends that the list provided by the City is incomplete. The Court first notes that the files in question do not appear to relate to Ruggieri's ADA claim or to the City's counterclaim. Rather, it appears that Ruggieri is seeking the files in order to show that the investigation leading to his resignation was tainted or fabricated because, he claims, his supervisors at the City did not like him for various reasons. The Court questions whether such evidence is relevant to the pending ADA claim as it relates

---

[3] Ruggieri specifically references "a list of files in the MIS (G) and ITG (Old G) drives." (Doc. 56, p. 1)

to events that happened several weeks after the counseling sessions at issue. However, it is unnecessary to make that determination in this instance because the Court finds that, even if the files are relevant to the ADA claim, Ruggieri was not diligent in his attempts to obtain the files he believed were being withheld. Accordingly, the drastic sanction of a default judgment is not warranted.

As noted, the City produced a list of files that it contends was responsive to Ruggieri's request. In fact, it appears that the City produced over 12,000 pages of documents containing thousands of file names from the City's computer system.[4] Attached to Ruggieri's now-withdrawn motion for summary judgment is an email thread between Ruggieri and defense counsel. (Doc. 52-8). In that conversation, dated November 26, 2018, Ruggieri asserts that the list provided by the City was incomplete. (Doc. 52-8, p. 1-2). Defense counsel responded as follows: "As to the issues you raise as to the City's response to Discovery Request 3 [the aforementioned list of files], I will have to forward those on to the City and get back to you. I am aware that one of the lists was a list of snapshots and I think [it] was produced just to show that there was no snapshot of the time you requested." (Doc. 52-8, p. 1). In the same email, and in the present motion, Ruggieri explains with great technical precision why he believes that the list of files is incomplete. However, Ruggieri did not file any motions with the Court attempting compel

---

[4] Ruggieri attached these files to the motion for summary judgment that was later withdrawn.

disclosure or in any way resolve that issue prior to the discovery deadline. Rather, Ruggieri waited until discovery was closed to seek judgment in his favor based on an explanation that, he says, "would lead a reasonable person to infer that it was never the Defense's intention to provide these documents." (Doc. 56, p. 2). The Court is not persuaded.

While the Court recognizes that Ruggieri is appearing *pro se* and is entitled to a certain amount of leniency not afforded to those represented by counsel, the Eleventh Circuit has held that a *pro se* litigant "is subject to the relevant law and rules of court including the Federal Rules of Civil Procedure." *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989), cert. denied, 493 U.S. 863, 110 S.Ct. 180, 107 L.Ed.2d 135 (1989). A review of the record in this case reveals that Ruggieri has filed numerous motions with the Court throughout this litigation and, therefore, could have petitioned the Court to resolve this issue prior to the discovery deadline. However, he failed to do so. The Court does not find that the City disobeyed any discovery orders or that it acted inappropriately in any way. Therefore, the Court declines to impose the drastic sanction of a default judgment against the City with regard to this issue.

## B. The requested depositions

Ruggieri also seeks default judgment as a sanction for the City's alleged failure to provide certain depositions. According to Ruggieri, he sought to depose

Greg Boykin, Brian Foshee, Melinda James Lopez, and "the officer that performed the forensic analysis" of Ruggieri's work computer. (Doc. 56, p. 2-3). On August 27, 2018, Ruggieri filed a document entitled "Plaintiff Request for Deposition of Greg Boykin and the Officer that performed the forensic analysis" which stated as follows: "The Plaintiff requests the opportunity to depose Greg Boykin and the Officer that performed the forensic analysis." (Doc. 25). Ruggieri's notice did not set forth a time and place for the requested depositions. During his own deposition, Ruggieri also orally requested to depose Melinda James Lopez and Brian Foshee. *See* (Doc. 62-2, p. 9, 31-32). Ruggieri asserted that he did not depose these individuals and, as a result, seeks a default in his favor.

The Court first notes that Ruggieri does not specifically accuse the City of actively preventing him from taking these depositions. Rather, he appears to argue that it was the City's responsibility to schedule the depositions and that its failure to do so warrants severe sanctions. Ruggieri cites no authority for this drastic proposition. Instead, he points to various email exchanges with defense counsel regarding the scheduling of depositions and claims that "a reasonable person would see that the scheduling request was in the Defense's hands at that point." (Doc. 56, p. 2). The Court has reviewed these emails and does not come to the same conclusion. In its response to Ruggieri's motion, the City attached an email conversation from April 18, 2019, in which it noted the July 1, 2019, discovery

deadline and suggested dates for Ruggieri to take the depositions he requested. In that email, defense counsel proposed dates for Ruggieri's deposition and stated: "Then you could take your depositions also sometime that week or the following week (June 17 – 21) or maybe even the week after that (June 24 – 28)." (Doc. 54-2, p. 2). Thus, the record in no way suggests that defense counsel tried to prevent Ruggieri from taking the requested depositions. To the contrary, defense counsel seemed helpful in suggesting available dates. However, it does not appear that Ruggieri followed up on the issue until well after the discovery deadline had passed.

The Court is aware of no authority that would allow it to sanction a party for failing to schedule the opposing party's depositions. Ruggieri did not file a motion to compel these depositions and has pointed to nothing in the record suggesting that the defense acted improperly or tried to prevent these individuals from being deposed. Accordingly, the Court declines to grant a default judgment on this basis.

For the foregoing reasons, the Court finds that Ruggieri's "Motion Requesting Default Judgment and Complete Dismissal of the City of Hoover's Counterclaim" (Doc. 56) is due to be **DENIED**.

## III. Ruggieri's "Motion for Summary Judgment based upon Defense/Defendant Misconduct" (Doc. 71)

The Court next addresses Ruggieri's "Motion for Summary Judgment based upon Defense/Defendant Misconduct."[5] (Doc. 71). In this motion, Ruggieri again asserts that the defense failed to produce a complete list of files that he requested in discovery and failed to provide dates for the depositions discussed above. Nowhere in the motion does Ruggieri point to portions of the record indicating that there is no genuine issue of material fact as to his ADA claim or the City's counterclaim. Thus, the motion is not actually seeking relief under Rule 56, Fed. R. Civ. P., but is again seeking sanctions under Rule 37, Fed. R. Civ. P., and the Court will treat it as such. Although he again goes into painstaking detail about how the list of files the City produced can be proven to be incomplete, including screenshots from the City's website showing that the City's budget provided for hiring someone to manage backup storage devices, Ruggieri's motion is simply rehashing the arguments he made in his motion for default judgment.

The motion also accuses defense counsel of misconduct. However, the allegations of misconduct are again based on Ruggieri's assertion that the City did not produce a complete list of files in response to one of his discovery requests. The motion goes on to provide the Miriam-Webster definition of the word "deceit," followed by Ruggieri's commentary on the City's litigation methods. However, the Court has thoroughly examined the record and finds absolutely

---

[5] This motion is also the subject a motion to strike filed by the City. (Doc. 72).

nothing to suggest that defense counsel has engaged in any misconduct or deceptive practices. To the contrary, the various communications that are included in the record show that defense counsel has been courteous and accommodating throughout these proceedings. Ruggieri's allegations of misconduct appear to be based on his unfamiliarity with the litigation process. For the reasons stated in the previous section, this motion (Doc. 71) is due to be **DENIED**, and the City's motion to strike it (Doc. 72) is **MOOT**.

### IV.    The City's Motion for Summary Judgment (Doc. 60)

The Court next turns to the City's motion for summary judgment. (Doc. 60). As noted, the City has moved for summary judgment in its favor as to Ruggieri's ADA claim and in its own favor as to its counterclaim. Because the Court is dismissing the City's counterclaim, it will not address the City's contention that it is entitled to summary judgment on that issue.

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment always bears the initial

responsibility of informing the Court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id*. at 324, 106 S.Ct. 2548.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Anderson"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249, 106 S.Ct. 2505.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc*., 131 F.3d 995, 999

(11th Cir. 1997). "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 248, 106 S.Ct. 2505 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp*., 477 U.S. at 322, 106 S.Ct. 2548. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co*., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (*citing Anderson*, 477 U.S. at 250-51, 106 S.Ct. 2505).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (*quoting Anderson*, 477 U.S. at 251-52, 106 S.Ct. 2505); *see also LaRoche v. Denny's, Inc*., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear ... that

suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

**B. The City's Motion as to Ruggieri's ADA Claim**

The following facts are undisputed by either party. Ruggieri was employed by the City from July 2015 through November 2017 as a Network Systems Specialist. In May of 2017, Ruggieri was in a meeting with five or six other employees when he took a knife out of his pocket and opened the blade. Ruggieri claims that he was using it to dig a splinter from underneath his fingernail and denies that he used it in a threatening manner. In his deposition, Ruggieri stated that "the only danger that was there was to my cuticles." (Doc. 62-2, p. 20). One of the employees who was at that meeting reported the incident to Ruggieri's supervisor, Melinda Lopez. (Doc. 62-3, p. 2). Another employee also reported to Lopez that Ruggieri used unacceptable language while exhibiting uncontrolled frustration during work hours. *Id.* Additionally, other employees told Lopez that Ruggieri raised his voice and acted disrespectfully towards other employees. *Id.*

Based on those reports, Lopez had a formal counseling session with Ruggieri in which, she said, she sought to address his alleged inappropriate behavior. Lopez prepared a memorandum of that meeting and had Ruggieri sign it. (Doc. 62-3, p. 6-7). Lopez also required Ruggieri to attend counseling sessions through the American Behavioral Employee Assistance Program ("EAP"). In her

affidavit, Lopez asserted that "[t]he purpose of this counseling was to help Mr. Ruggieri correct his behavior, to help him channel his feelings and passion in a more professional or non-threatening way, and to assess whether Mr. Ruggieri presented a threat to others in the workplace." (Doc. 62-3, p. 3). According to Lopez, Ruggieri "said he understood the part about the language and admitted he had a problem with that." *Id.*

Following his meeting with Lopez, Ruggieri attended three counseling sessions with a psychologist from the EAP. The sessions began on July 11, 2017, and ended on July 26, 2017. Ruggieri continued to work and to be paid while he was attending the sessions. According to Ruggieri, the psychologist found nothing wrong with him and released him after three sessions. This is supported by the psychologist's notes and her emails to Ruggieri's supervisors. (Doc. 62-2, p. 94-101). These counseling sessions are the sole basis of Ruggieri's ADA claim. Although it is not entirely clear from his complaint, Ruggieri's subsequent filings suggest that his referral to counseling was somehow connected to the investigation that ultimately led to his resignation. However, Ruggieri has not alleged a claim for constructive discharge, retaliation or any other cause of action related to his separation from employment with the City.

## 1.  The City's Argument[6]

Ruggieri brings his claim under 42 U.S.C. § 12112(d)(4)(A), which provides that a covered employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."  The City argues, among other things, that there exists no genuine issue of material fact as to whether the City's requirement that Ruggieri attend counseling was job related and consistent with business necessity.

The Eleventh Circuit addressed a similar situation in *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013).  The Plaintiff in that case, an employee of the defendant, expressed frustration during a meeting with his supervisor over allegations that he was mistreated by other managers at the company.  At one point during the meeting, the plaintiff appeared to become agitated, "banged his hand on the table where they sat, and said that someone was 'going to pay for this.'"  *Id.* at 1309.  After the meeting was over, the plaintiff's supervisor reported his behavior to her superiors, and it was determined that the plaintiff should be evaluated by a third-party psychologist.  According to the

---

[6] In its motion, the City put forth multiple arguments as to why it was entitled to summary judgment on this issue.  Because the Court finds that summary judgment is appropriate based on the argument discussed in this section, it expresses no opinion and makes no findings regarding the other arguments.

defendant, supervisors at the company were concerned "'because it sounded as though a threat had been made against an employee, or employees of the company.'" *Id.* The plaintiff was required to attend several counseling sessions and to complete certain psychometric tests that were evaluated by a psychiatrist. The plaintiff was ultimately allowed to continue working for the defendant.

In bringing suit under 42 U.S.C. § 12112(d)(4)(A), the plaintiff in *Owusu-Ansah* argued, as Ruggieri does, that the counseling sessions violated his rights under the ADA. The Eleventh Circuit held that the counseling sessions did not violate the ADA because they were both job-related and consistent with business necessity. *Id.* at 1311. The Eleventh Circuit held:

> The phrase "job-related and consistent with business necessity" appears not only in § 12112(d)(4)(A) of the ADA, but in §§ 12112(b)(6), 12113(a), and 12113(c) as well. We have said that "job-relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer" as a basis for an employment decision, while "[b]usiness necessity, in context, is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria" for such a decision. *See Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1317 (11th Cir. 2009) (interpreting language in § 12113(a)) (internal quotation marks and alterations omitted). Because "[a] term appearing in several places in a statutory text is generally read the same way each time it appears," *Ratzlaf v. United States*, 510 U.S. 135, 143, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), we use the *Allmond* definitions here.
>
> In *Watson*[*v. City of Miami Beach*, 177 F.3d 932 (11th Cir. 1999),] we held that in "any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity." 177 F.3d at 935. We explained

that "the ADA does not, indeed cannot, require a police department to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries." *Id*. Although Mr. Owusu–Ansah was not employed as a police officer engaged in dangerous work, *Watson* provides some guidance for us. *See also Williams*[ *v. Motorola, Inc.,* 303 F.3d 1284, 1290-91 (11th Cir.2002),] (noting in dicta that an employer could have lawfully required medical examination for employee who was hostile, made threats, and was insubordinate). Given the information it had about Mr. Owusu–Ansah at the time, Coca–Cola did not violate § 12112(d)(4)(A) by requiring him to undergo a psychiatric/psychological fitness-for-duty evaluation. The evaluation, in our view, was "job-related and consistent with business necessity."

The evaluation was "job-related" because an "employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position." *Williams*, 303 F.3d at 1290. Ms. Cabral reported that Mr. Owusu–Ansah—in the course of complaining about discrimination and harassment—banged his fist on the table and said in a raised voice that someone was "going to pay for this." When he was deposed, Mr. Owusu–Ansah denied having behaved that way during his meeting with Ms. Cabral, and he now points out that there were no prior incidents showing that he had a propensity for workplace violence. That, however, is not dispositive. Although Coca–Cola apparently never asked Mr. Owusu–Ansah for his version of what happened at the meeting, it did not rely solely on Ms. Cabral's account in ordering the evaluation. Coca–Cola knew that Mr. Owusu–Ansah had refused to speak to Ms. Welsh and Dr. Riddell about his workplace problems. In addition, Dr. McElhaney—the consulting psychologist—expressed "significant concerns" to Coca–Cola about Mr. Owusu–Ansah's emotional and psychological stability, and recommended a psychiatric/psychological fitness-for-duty evaluation.

On this record, we conclude that Coca–Cola had a reasonable, objective concern about Mr. Owusu–Ansah's mental state, which affected job performance and potentially threatened the safety of its other employees. Though Mr. Owusu–Ansah worked from home, he had access to and was required to attend meetings at the Dunwoody call center. *See, e.g., Krocka v. City of Chicago*, 203 F.3d 507, 515

(7th Cir. 2000) ("We have stated that where inquiries into the psychiatric health of an employee are job related and reflect a concern with the safety of employees, the employer may ... require that the employee undergo a physical examination designed to determine his ability to work."); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999) ("[W]e note that the district's obtaining advice that further examination was needed to determine Sullivan's fitness to work buttresses the district's claim that it had reason to believe Sullivan could not perform some essential aspects of his job.").

For basically the same reasons, the evaluation was also "consistent with business necessity." Though it may not be one of the traditional canons of statutory construction, common sense is not irrelevant in construing statutes, and in our view an employer can lawfully require a psychiatric/psychological fitness-for-duty evaluation under § 12112(d)(4)(A) if it has information suggesting that an employee is unstable and may pose a danger to others. *See Conroy,* 333 F.3d at 97 ("[B]usiness necessities may include ensuring that the workplace is safe and secure."). *See also E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir.1995) ("It would seem that a requirement that employees not pose a significant safety threat in the workplace would obviously be consistent with business necessity: a safe workplace is a paradigmatic necessity of operating a business."); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1119 (11th Cir.1993) (holding that protecting employees from workplace hazards is a "business necessity" under Title VII).

715 F.3d at 1311-12 (footnotes omitted).

This Court finds the facts of the present case to be sufficiently similar to the facts in *Owusu-Ansah*. It is undisputed that Ruggieri's supervisor, Melinda Lopez, was informed that Ruggieri had displayed behaviors at work that were perceived as threatening, i.e., pulling out a knife at a staff meeting, exhibiting uncontrolled frustration, and using inappropriate language. Although Ruggieri maintains that he did not use the knife in a threatening manner and denies that he ever raised his

voice at work, he does not dispute that the reports were made to Lopez. Viewing the evidence in the light most favorable to Ruggieri, the Court concludes, as the Eleventh Circuit concluded in *Owusu-Ansah*, that Lopez had a "reasonable, objective concern about [Ruggieri's] mental state." *Id.* at 1312. Accordingly, the City's decision to send Ruggieri to EAP counseling sessions was job-related and consistent with business necessity. Consequently, it did not violate the ADA. Based on these facts, any employer would be justified in erring on the side of caution by addressing such behavior before it has the chance to escalate.

Ruggieri contends that, when Lopez referred him to counseling, she told him that it "was not derived from [nor did it have] any bearing on [his] job performance." (Doc. 35, p. 1). Ruggieri incorrectly argues that this statement proves that the counseling was not job-related. While the counseling did not relate to Ruggieri's specific duties, it did relate to his overall "ability to handle reasonably necessary stress and work reasonably well with others[.]" *Owusu-Ansah*, 715 F.3d at 1311. Thus, like the counseling sessions at issue in *Owusu-Ansah*, Ruggieri's sessions were related to his job and did not violate the ADA.

In his response to the City's motion for summary judgment, Ruggieri repeats his contention that the counseling sessions were not related to his job performance. He also asserts that his supervisors' actions after the incident with the knife did not suggest that they perceived him as a threat. Therefore, Ruggieri contends that the

City's decision to send him to counseling was "a method of grinding the Plaintiff down" because, he says, he was perceived as a threat to "Mrs. Lopez's totalitarian authority." (Doc. 63, p. 3).

While Ruggieri's response makes clear his belief that his supervisors did not like him, it does not point to any evidence suggesting that Lopez did not have a reasonable, objective concern about his mental state. As noted above, when faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. Ruggieri has failed to point to any evidence that would dispute the City's evidence that the counseling sessions were job-related and a business necessity.[7] In order to succeed at trial, Ruggieri would be required to do this. Accordingly, there is no genuine issue of material fact as to the City's contention that the counseling sessions were job-related and a business necessity and therefore did not violate the ADA. Accordingly, the City's motion for

---

[7] The only disputed facts that Ruggieri identifies relate to the discovery issues discussed in Section II of this opinion. As noted, those issues do not pertain to Ruggieri's ADA claim and are not material elements of that cause of action.

summary judgment (Doc. 60) is due to be **GRANTED** as to Ruggieri's ADA claim.

Because the Court is declining to exercise supplemental jurisdiction over the City's counterclaim, it is unnecessary to discuss the merits of the City's motion for summary judgment as to that claim. Accordingly, the City's motion for summary judgment is **MOOT** as it relates to its counterclaim.

For the foregoing reasons, Ruggieri's Motion Requesting Default Judgment and Complete Dismissal of the City of Hoover's Counterclaim (Doc. 56) is **DENIED**; Ruggieri's Motion for Summary Judgment based upon Defense/Defendant Misconduct (Doc. 71) is **DENIED**; the City's motion to strike Ruggieri's Motion for Summary Judgment based upon Defense/Defendant Misconduct (Doc. 72) is **DENIED AS MOOT**; the City's Motion for Summary Judgment (Doc. 60) is **GRANTED** as it relates to Ruggieri's ADA claim and **DENIED AS MOOT** as it relates to the City's counterclaim. The City also filed a motion to strike the medical records that Ruggieri attached to his response to its motion for summary judgment and to strike Ruggieri's sur-reply to the City's reply in support of its motion for summary judgment (Doc. 68). Because the Court did not consider Ruggieri's medical records or his sur-reply brief in reaching its decision, that motion is **DENIED AS MOOT**.

Based on the foregoing, this case is due to be **DISMISSED WITH PREJUDICE**.  A separate order will be entered.

**DONE** and **ORDERED** March 12, 2020.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE